[L. A. No. 26830.   In Bank.   Oct. 23, 1962.]

BETTE DAVIS MERRILL, Plaintiff and Respondent, v. RONALD L. BUCK et al., Defendants and Appellants.

554

Schell & Delamer, Richard B. Goethals, Earle K. Stanton, Crider, Tilson & Ruppé and Henry E. Kappler for Defendants and Appellants.

Steinmetz & Murrish, Magana & Olney, William B. Murrish, Fred H. Steinmetz and Raoul D. Magana for Plaintiff and Respondent.

DOOLING, J.*—Plaintiff as lessee of a dwelling house brought this action for damages for personal injuries sustained as the result of her fall down a flight of basement stairs. Defendants were Mr. and Mrs. Buck, the owners of the house; Mrs. Clark, the real estate saleswoman who showed the house to plaintiff and negotiated the lease; and Lelah T. Pierson, the real estate agent employing Mrs. Clark. The jury returned a verdict of $65,700 against all defendants and judgment was entered accordingly. Defendants appeal from the judgment and from the order denying their motions for a judgment notwithstanding the verdict or, in the alternative, for a new trial. They contend that (1) the evidence does not sustain the verdict and judgment and (2) there was error in the instructions.

On June 22, 1957, Mrs. Clark took plaintiff to see the Buck's house, a furnished one-story ranch type dwelling in the Brentwood area of Los Angeles. They spent approximately one to one and one-half hours inspecting the premises, with Mrs. Clark pointing out various features considered important to a prospective tenant. That evening plaintiff telephoned Mrs. Clark that she would rent the house. Mrs. Clark prepared the lease, and on June 24 plaintiff and the Bucks signed it. The lease was for one year at a rental of $675 a month commencing June 29, 1957, and it provided that the lessor "shall not be called upon to make any improvements or repairs whatsoever upon the said premises, or any part thereof, but the

---

*Assigned by Chairman of Judicial Council.

said Lessee agrees to keep the same in good order and condition at her own expense.''

On June 29, 1957, plaintiff moved into the house. That afternoon she opened a door in the central hall of the house, took a step forward and fell down a flight of stairs into the basement. She suffered a broken back, a broken right index finger, and a blackout coma from the fall.

The door to the basement opened inward over the top step which was 9 inches wide and 7¾ inches below the level of the hall floor. There was no landing at the top of the stairway and only a 3½-inch sill. The stairway was a little less than 4 feet across, had cement walls at its sides and no handrails. There were no windows in the basement but there was a light switch on the wall at the top of the stairs inside the basement. The stairway descended 7 feet to the basement floor and it was the only means of access to the basement.

Upon entering the one-floor house there was a circular entry hall, with a den on one side and a living room on the other. Running from the entry hall through the center of the house there was a narrow central hall, with several doors on either side leading into adjoining rooms. At the commencement of the central hall there was on one side a large linen closet and directly opposite on the other side was the door leading to the basement. There was a door, with its top half louvered, between the entry hall and the central hall. The louvered door and the basement door were each 28 inches wide and when opened against the central hall wall, the louvered door practically covered the basement door.

Plaintiff testified that when she and Mrs. Clark inspected the house, the louvered door between the entry hall and the central hall was open, and she did not see the basement door. Mrs. Clark neither mentioned the concealed door nor told her there was a basement under the house. Plaintiff did not again visit the house until she moved there. That afternoon in the process of moving, plaintiff closed the louvered door and then discovered the previously hidden door (leading to the basement). She ''could tell from the door jamb'' that the door ''obviously went in'' but she nevertheless assumed that it was a door to another closet. With ''natural curiosity'' she opened the door, ''went with the knob,'' took a ''tiny step'' forward, and was ''propelled through black, into black space.'' Sometime later she discovered that she was on the floor of the basement.

Mrs. Clark testified that when she and plaintiff inspected

the house, she had her car keys in her hand and as she passed the door leading to the basement, she tapped the door with her keys and said, ''Basement Door.'' At that time plaintiff was 3 or 4 feet behind her in the central hall, and she did not know whether plaintiff heard her statement. The next day after plaintiff had said she would rent the house but before the lease was signed, she asked plaintiff if the Bucks could leave ''some things stored in the basement'' and plaintiff agreed that they could. Mrs. Clark had herself been in the basement some six months to a year prior to showing the house to plaintiff as part of a group of about 20 members of the Pierson realty organization making a tour of the house and knew of the condition of the stairway leading to the basement.

Plaintiff testified that she never met the Bucks prior to the accident and that she had no recollection of any conversation with Mrs. Clark relative to the basement or the Bucks' use of any portion thereof for storage. We must assume that the jury found on this conflicting evidence the facts most favorable to the plaintiff.

Plaintiff sought recovery against the owners Buck upon the basis of common-law principles of landlord and tenant negligence law, that they were liable for failure to warn plaintiff of the known latent danger behind the basement door, the precipitous stairway becoming a veritable trap causing plaintiff's injuries. She also contended that the construction of the stairway violated the Los Angeles building ordinance and within its application constituted a ''danger to life and limb.'' Her claim against the defendant realtors, Pierson and Clark, rested on their voluntary undertaking to show her the house and their negligence, as business volunteers, in failing to warn her of the existence of the doorway, the stairs and the basement.

Plaintiff relies, as against defendants Buck, upon the rule ''that, if there is some hidden defect in the premises, or danger thereon, which is known to the lessor at the time of making the lease, but which is not apparent to the intending lessee, the lessor is bound to inform the latter thereof, and failing so to do, he is liable for injuries to the tenant arising therefrom. [Citations.]'' (*Shotwell* v. *Bloom*, 60 Cal.App.2d 303, 309-310 [140 P.2d 728] ; *Stanley* v. *Lander*, 3 Cal.App.2d 284, 289 [39 P.2d 225].) This is a case where the danger was not patent but latent; the danger of the basement stairs was a concealed hazard. A distinction must be drawn between patency of exterior visibility and patency of content of

danger. True, the basement door was visible for anyone to see, and from this premise defendants Buck argue that plaintiff had every reasonable opportunity to discover where such door led; and since she failed to make use of such opportunity, she failed to observe care with respect to a patent, not a latent, matter within the rule of nonliability of the landlord. ▇ But "patent" in the test of duty to warn refers to the patency of danger and not merely to exterior visibility, and the cases so hold: e.g., *Shotwell* v. *Bloom, supra*, 60 Cal.App. 2d 303 (where a crack in the fireplace was physically visible but the hazard of using the fireplace and thereby causing the fire was obscured so as to create a latent rather than patent danger); *Couch* v. *Pacific Gas & Elec. Co.*, 80 Cal.App.2d 857 [183 P.2d 91] (where the tenant did not know that some wires protruding through a hole in the kitchen floor were energized; the wires were visible and so patent but the danger was latent; and therefore the landlord was under the duty to warn the tenant of the latent defect in the premises. ▇ Similarly here, the danger inhering in the precipitous basement stairs, without landing or handrail, lying immediately behind the inward swinging basement door, was a concealed hazard. The basement door was a visible object but the jury under the prevailing circumstances might well find that the danger of the precipitous basement stairway was not—creating a latent, not a patent, defect in the leased house. Cases cited by defendants are distinguishable on their facts: the dangers were not merely patent but admittedly known to the tenant in full prior to the accident concerned (e.g., *Sherrard* v. *Lidyoff*, 108 Cal.App.2d 325 [239 P.2d 28] [cracked stairway board]; *Zavalney* v. *Donovan*, 70 Cal.App.2d 182 [160 P.2d 558] [cracked porcelain faucet handle]; *Dorswitt* v. *Wilson*, 51 Cal. App.2d 623 [125 P.2d 626] [cracked ceiling]; *Colburn* v. *Shuravlev*, 24 Cal.App.2d 298 [74 P.2d 1060] [defective rug]) or the dangers were so open and obvious to reasonable inspection that no question of a latent defect could be raised (e.g., *Powell* v. *Stivers*, 108 Cal.App.2d 72 [238 P.2d 34] [visible coils of cord lying in the passageway]; *De Motte* v. *Arkell*, 77 Cal.App. 610 [247 P. 254] [shrunken and warped wooden railing]) or the dangers were not even known to the landlord (e.g., *Shanander* v. *Western Loan & Bldg. Co.*, 103 Cal.App. 2d 507 [229 P.2d 864, 26 A.L.R.2d 1039] [concealed defective plumbing system]; *Ayres* v. *Wright*, 103 Cal.App. 610 [284 P. 1077] [concealed defect of wood rot in a porch guardrail]).

As a further basis of liability of defendants Buck, plaintiff

submitted that the construction of the basement stairs violated the Los Angeles City Building Code and the court instructed on the effect of such violation.

The Los Angeles Building Code, as enacted June 29, 1956, and in effect at the time of this accident, required that every door in a dwelling shall open upon a landing at least equal in width and length to the width of the door, and the landing shall not be greater than 2 inches below the threshold. (§ 91.4913(c).) A stairway like the basement stairs in the Buck house was required to have at least one handrail. (§ 91.4916.) While the Buck house was built before enactment of the above 1956 ordinance sections, the requirements thereof were made applicable to existing houses in which a condition existed whereunder any stairway failed to comply with the building code to an extent that endangered the life, limb, health, property, safety or welfare of the public or occupants of the building. (§§ 91.0103; 91.4901.)

The trial court properly instructed the jury on the above requirements of the city building code in relation to the issue of negligence per se of the Bucks for violation of the ordinance sections, but it added a further instruction as follows: ''A further portion of the Building Code creates a presumption concerning danger to life, limb and property which must govern your judgment so far as you may find it applicable and not overcome by evidence, if any, negativing such danger.

''Section 91.0103 of the Building Code provides a building or portion thereof shall be presumed to be a menace to life or limb, health, property, or public welfare, if any stairway (or any other portion of said building communicating from any part therewithin to the exterior ground surface) does not provide the degree of security to life or limb, health, property or public welfare required by any portion of the Building Code, including the landing and handrail sections respecting dwelling-house stairways heretofore related to you. If you find this presumption applicable, then unless you find this presumption controverted by direct or indirect evidence, if any, of absence of danger, I instruct you that you are bound to find in accordance with the presumption, and accordingly are bound to find that the dwelling-house landing and handrail requirements . . . heretofore related, do apply even to pre-existing dwellings or residential buildings.''

The instruction applied the presumption to ''any stairway'' while the building code made such presumption applicable

to an "exit" which did "not provide the required degree of security to life or limb, health, property or public welfare." (§ 91.0103(a)(2).) The code defined an "exit" as "A passageway from a portion of a building to the exterior ground surface including every intervening doorway, passageway, stairway or ramp." (§ 91.0403.)

We may concede that this instruction is open to the objection of applying an erroneous concept to plaintiff's accident by treating it as related to use of the basement stairway as an "exit to the exterior ground surface." Its effect was to place on the Bucks the burden of going forward with proof that they had complied with the code and were therefore not negligent as a matter of law. In the absence of such instruction the jury would first have to find that the basement stairway constituted a dangerous condition in fact before the building code sections could be applied to the Buck house as the premise of liability.

Defendants Buck also complain that the jury was improperly denied consideration of their defense of assumption of the risk of such defects as a reasonable inspection of the premises would reveal. The jury was instructed that the doctrine of assumption of the risk does not apply in cases of the violation of ordinances such as the building code regulating public safety and providing for the "protection of human life."

However, conceding that there was error in these instructions concerning the effect of the Los Angeles building ordinance as applied to the defendants Buck, we can find no prejudice in the giving of such instructions under the facts of this case. The court at the time of admitting the evidence of the Los Angeles building ordinance admitted this evidence only against the defendants Buck and not against the defendant realtors, and in its charge to the jury the court expressly instructed: "The evidence concerning certain building ordinances applies only in this case to the defendants Buck, but not against the defendants Pierson and Clark, the realtors." In view of this express instruction the jury's verdict against the defendant realtors cannot have been based upon the supposed violation of the building ordinance, but must have been based upon a finding that without regard to any building ordinance the basement door and stairway constituted a concealed hazard the failure to disclose which amounted to actionable negligence. Since no greater duty of disclosure could rest upon defendant realtors than upon defendants Buck, it is clear that the verdict must have gone against defendants Buck even if

the alleged violation of the building ordinance had not been submitted to the jury at all.

■ Defendants Buck also argue that the evidence established beyond dispute plaintiff's contributory negligence, for a person who proceeds into a place of "impenetrable darkness" and falls into an opening "does not as a matter of law exercise ordinary care for her own safety." But the record here does not indicate that plaintiff in conscious disregard of the hazard of darkness proceeded deliberately through the basement door. (Cf. *Mitchell* v. *A. J. Bayer Co.*, 126 Cal.App.2d 501 [272 P.2d 870]; *Robinson* v. *King*, 113 Cal.App.2d 455 [248 P.2d 477].) In fact the jury could find that the darkness element did not contribute to her fall but rather the hazard arose from the physical construction of the inward swinging door pulling her over the precipitous stairway, resulting in her fall. The question of plaintiff's contributory negligence was properly submitted to the jury.

■ It is admitted that at the time of showing the property to the plaintiff the defendant realtors were not acting as agents either of the plaintiff or of the defendants Buck. Because there was no privity of contract between themselves and plaintiff or between themselves and the property owners Buck these defendants insist that no duty was cast upon them to warn the plaintiff of a hidden danger in the property of which they knew and of which the plaintiff was unaware. In assaying the validity of this argument it is necessary to consider the entire relationship existing between the parties. In showing this home to plaintiff these defendants were not motivated by altruism but by the hope of business profit. The rental of real property was a part of their regular business. In the pursuit of that business they were led to undertake the showing of the property to plaintiff by the hope of earning a commission from the property owners if the plaintiff could be persuaded to rent it. When they undertook to show the property to the plaintiff with the purpose of inducing the plaintiff to rent it so that they might earn a commission they knew (we must assume from the jury's verdict against them) that there was a latent hazard on the property which was unknown to the plaintiff and which might foreseeably result in injury to the plaintiff if she did rent the property.

■ Privity of contract is not necessary to establish the existence of a duty to exercise ordinary care not to injure another, but such duty may arise out of a voluntarily assumed relationship if public policy dictates the existence of such a

duty. (*Silva* v. *Providence Hospital*, 14 Cal.2d 762, 775 [97 P.2d 798]; *Perry* v. *D. J. & T. Sullivan, Inc.*, 219 Cal. 384, 390 [26 P.2d 485]; *Darnold* v. *Voges*, 143 Cal.App.2d 230, 248 [300 P.2d 255]; *Johnston* v. *Orlando*, 131 Cal.App.2d 705, 709 [281 P.2d 357]; *Valdez* v. *Taylor Automobile Co.*, 129 Cal.App.2d 810, 817 [278 P.2d 91].)

We said in *Biakanja* v. *Irving*, 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358] : ''The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.'' (See also *Lucas* v. *Hamm*, 56 Cal.2d 583, 588 [15 Cal.Rptr. 821, 364 P.2d 685]; *Stewart* v. *Cox*, 55 Cal.2d 857, 863 [13 Cal.Rptr. 521, 362 P.2d 345]; *Burke* v. *Zanes*, 193 Cal.App.2d 773, 777 [14 Cal.Rptr. 619].)

This case meets these several tests. The transaction was intended to affect the plaintiff by bringing about the very relation of landlord and tenant between the Bucks and plaintiff which led to her occupancy of the property and ensuing injury and the jury's verdict establishes the foreseeability of harm to her, the certainty that she suffered injury and the closeness of the connection between the defendants' conduct and the plaintiff's injury. We have no doubt of the moral blame in this case in view of these defendants' knowledge of the hazard to which they were exposing plaintiff by their failure to warn her, and the policy of preventing future harm will clearly be served by imposing liability upon them.

The case is admittedly one without exact precedent, but we are satisfied that, having affirmatively undertaken to show the house to plaintiff in the regular course of their business with the purpose of earning a commission if she decided to rent it, these defendants were under a duty of care to warn her of a concealed danger in the premises of which they were aware and from which her injury might be reasonably foreseen if she did become a tenant. It was for the jury to determine the extent of the hazard, the question of latency, and the character of the conduct of these defendants necessary to constitute the exercise of reasonable care under all of the circumstances. (*McEvoy* v. *American Pool Corp.*, 32 Cal.2d

295, 299 [195 P.2d 783]; *Hall* v. *Barber Door Co.*, 218 Cal. 412, 420 [23 P.2d 279]; *Dahms* v. *General Elevator Co.*, 214 Cal. 733, 742 [7 P.2d 1013].)

These defendants claim that the furthest extent of their possible duty was to take care that plaintiff was not injured while she was examining the house in the company of defendant Clark, but this argument overlooks the fact that the tour of inspection was for the very purpose of persuading plaintiff to become a tenant and that the possibility of her injury from the concealed hazard if she did become a tenant was reasonably foreseeable unless she was advised of the latent danger.

The argument that the negligence of defendants Buck in failing to warn plaintiff and in allowing the dangerous condition of the premises to continue was an intervening force to break the chain of causation of the negligence of the realtors is answered by the settled rule that two separate acts of negligence may be the concurring proximate causes of an injury. (*Fennessey* v. *Pacific Gas & Elec. Co.*, 20 Cal.2d 141, 145 [124 P.2d 51]; *Lacy* v. *Pacific Gas & Elec. Co.*, 220 Cal. 97, 98 [29 P.2d 781]; 35 Cal.Jur.2d 565.) The questions of proximate cause and intervening force to break the chain of causation were properly submitted to the jury and decided adversely to these defendants.

Defendant realtors complain of the form of an instruction upon the duty of a volunteer to use ordinary care. The instruction was a correct statement of the law so far as it went and if these defendants desired a more detailed instruction on the subject it was their duty to propose it. (*State Rubbish etc. Assn.* v. *Siliznoff*, 38 Cal.2d 330, 340 [240 P.2d 282]; *Peri* v. *Los Angeles Junction Ry. Co.*, 22 Cal.2d 111, 129-130 [137 P.2d 441].)

Finally defendant realtors urge the failure to give an instruction proposed by them on the duty of a tenant to make a reasonable examination of the premises for defects and her assumption of the risk of concealed dangers which might have been discovered if she fails to do so. The instruction as proposed was incomplete in omitting the qualification, given in a similar instruction with regard to defendants Buck, that this rule is not applicable "where the condition . . . is such that a reasonable inspection of the premises by a person of ordinary prudence would itself subject such person to the very dangers of the unsafe condition in question." No duty is cast upon the court to modify and give as modified a pro-

posed incomplete or erroneous instruction. (*Shaw* v. *Pacific Greyhound Lines,* 50 Cal.2d 153, 158 [323 P.2d 391].)

An order denying a motion for new trial is not appealable. (Code Civ. Proc., § 963.) The purported appeals from such order are accordingly dismissed. The judgment and the order denying a judgment notwithstanding the verdict are affirmed as to all appellants.

Gibson, C. J., Traynor, J., Peters, J., White, J., concurred.

McCOMB, J.—I dissent. I would reverse the judgment as to defendants Ronald R. Buck and Ann M. Buck, vacate the judgment against Jeanette M. Clark and Lelah T. Pierson, and order the trial court to enter an order that the motion of defendants Clark and Pierson for judgment notwithstanding the verdict be granted and to enter judgment thereon in favor of defendants Clark and Pierson, for the reasons expressed by Mr. Presiding Justice Wood in the opinion prepared by him for the District Court of Appeal in *Merrill* v. *Buck* (Cal.App.) 19 Cal.Rptr. 621.

Schauer, J., concurred.

Appellants' petitions for a rehearing were denied November 21, 1962. Schauer, J., and McComb, J., were of the opinion that the petitions should be granted.